IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANCISCO JAVIER CARRANZA,

          Petitioner,                No. CIV S-08-CV-2479 MCE CHS P

    vs.

JAMES WALKER,

          Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner, Francisco Javier Carranza, is a state prisoner proceeding *pro se* with a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a determinate term of forty-five years imprisonment following his convictions by jury trial in the Sacramento County Superior Court, Case No. 02F08252, for nine counts of second degree robbery.  The jury found true penalty enhancements pursuant to section 12022.53 of the California Penal Code for use of a firearm with respect to four of the second degree robbery counts.  The jury also found true a penalty enhancement pursuant to section 667(a) of the California Penal Code for a previous felony conviction.  With this petition, Petitioner challenges the constitutionality of his convictions.  Upon careful consideration of the record and applicable law, it is recommended that this petition for writ of *habeas corpus* relief be denied.

1

## II.  ISSUES PRESENTED[1]

Petitioner alleges four grounds for relief in his pending petition.  Specifically, Petitioner's claims are verbatim as follows:

> (1)   Prosecutorial misconduct rendered trial [sic] fundamentally unfair.  Prosecutor committed misconduct when she asked defendant about his alledged [sic] confession to uncharged bank robberies . . .
>
> (2)   Prosecutorial misconduct.  Prosecutor verbally pushed defendant to call FBI Agent a liar durring [sic] cross examination then vouched for agents [sic] credibility during closing.
>
> (3)   The cumulative effect of misconduct and improper vouching violated due process even if individual instances of misconduct did not.
>
> (4)   Trial court erred in dennying [sic] defendant's *Marsden* motion even after attorney declared a conflict.

Petitioner's first three claims all allege that the prosecutor committed prejudicial misconduct in varying ways during Petitioner's trial, and will be examined together in subsection (A).  Subsection (B) will address Petitioner's fourth and final claim that the trial court erred in denying his *Marsden* motion to substitute counsel.

## III.  FACTUAL BACKGROUND

The basic facts of Petitioner's crimes were summarized in the partially published opinion[2] of the California Court of Appeals, Third Appellate District, as follows:

> From June 2002 to September 2002, defendant committed five robberies of Bank of America branches in Sacramento.
>
> Defendant was interviewed by Agents Brian Alvarez and Minerva Shelton of the Federal Bureau of Investigation (FBI) at the end of September 2002.  According to Agent Alvarez, he read defendant his "Miranda rights," and defendant said he understood them. During the

---

[1] Petitioner's fifth and sixth claims were dismissed on July 17, 2009 after this court determined that Petitioner had failed to exhaust his remedies in state court.

[2] The appellate court's opinion in *The People v. Francisco J. Carranza*, No. C051387, was lodged in the record as Document 4 on November 24, 2009.

2

interview, defendant gave the agents details about the Sacramento robberies. The agents showed defendant still photographs taken from surveillance video of the robberies and defendant initialed the back of them.

Defendant testified at trial that it was the FBI agents who provided the details of the robberies to him during the interview. He admitted committing the Sacramento robberies only because Agent Alvarez promised to release his cousin and friends from custody if he did so.

(Lodged Doc. 4 at 2).

Following a jury trial, Petitioner was found guilty of committing five bank robberies involving nine victims. The jury found true a penalty enhancement for personal use of a firearm in one of the robberies involving four of the victims. The jury also found true a penalty enhancement for a prior felony conviction that qualified as a strike under California's Three Strikes law. Accordingly, Petitioner was sentenced to a determinate term of forty-five years imprisonment.

## IV.  PROCEDURAL HISTORY

Petitioner timely appealed his convictions to the California Court of Appeal, Third Appellate District. The appellate court affirmed his convictions in a reasoned opinion on July 9, 2007. Petitioner then sought review of his convictions in the California Supreme Court. That petition was denied without comment on November 24, 2007. Petitioner filed this federal petition for writ of *habeas corpus* on October 20, 2008. Respondent filed an answer on November 16, 2009. Petitioner did not file a traverse.

## V.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000). Federal *habeas corpus* relief is not available for any claim decided on the merits

in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Provided that the state court adjudicated the petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that

1    law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

2           Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

3    "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause,

4    a federal court may grant a writ of *habeas corpus* only if the state court arrives at a conclusion

5    opposite to that reached by the Supreme Court on a question of law, or if the state court decides the

6    case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*,

7    529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling

8    federal authorities "so long as neither the reasoning nor the result of the state-court decision

9    contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not

10   contain "a formulary statement" of federal law, but the fair import of its conclusion must be

11   consistent with federal law.  *Id*.

12          Under the "unreasonable application" clause, the court may grant relief "if the state

13   court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

14   the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

15   issue the writ "simply because that court concludes in its independent judgment that the relevant

16   state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

17   529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

18   federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

19          Finally, the petitioner bears the burden of demonstrating that the state court's

20   decision was either contrary to or an unreasonable application of federal law.  *Woodford*, 537 U.S.

21   at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

22                          **VI.  DISCUSSION**

23          **A.    Prosecutorial Misconduct**

24          In three separate but related grounds for relief, Petitioner claims that the prosecutor

25   committed prejudicial misconduct during his trial.  Specifically, Petitioner claims that the prosecutor

26   (1) improperly cross-examined him regarding his alleged confessions to uncharged Seattle bank

robberies after agreeing, pursuant to a defense motion in *limine*, to exclude all reference to those robberies; (2) "pushed" him to testify that a witness was lying and then improperly vouched for that witness' credibility during closing statements; and (3) that the cumulative effect of the prosecutor's misconduct violated his due process rights.  The California Court of Appeal, Third Appellate District, summarized the background of Petitioner's three prosecutorial misconduct claims as follows:

> Before trial, defense counsel moved to "exclude any reference" to "prior bank robberies in Seattle" committed by defendant.  When the court asked for the prosecutor's response, she stated, "I will admonish the witnesses."  The court responded, "All right.  Thank you."
>
> The questioning about which defendant complains occurred during defendant's cross-examination after he had just testified that he confessed to the charged robberies in exchange for a promise by Agent Alvarez that he would release his friends and cousin from custody, and that Alvarez was the one who provided him with the details about the charged robberies.  After this testimony, the prosecutor and defendant had the following exchange:

| | |
|---|---|
| "[THE PROSECUTOR:] | You gave [Agent Alvarez] information about Seattle, right? |
| "[THE DEFENDANT:] | Yeah.  I told him where I was living; that kind of stuff. |
| "[THE PROSECUTOR:] | Did you ever go into detail about Seattle robberies you committed? |
| "DEFENSE COUNSEL: | Objection.    I   would object.  Relevance.  We have had in *limines* about this. |
| "THE COURT: | Overruled. |
| "THE DEFENDANT: | Did that mean I answer? |
| "THE COURT: | Yes. |
| "THE DEFENDANT: | He told me about the Seattle robberies on Fourth Avenue and attempted robbery and that was all included in the thing he wanted me to sign. |
| "[THE PROSECUTOR]: | So when he says that you try to begin |

6

1                                      the conversation that he had with you by going into detail about these three

2                                      Seattle robberies he's mistaken?

3       "[THE DEFENDANT:]         He is lying.

4       "[THE PROSECUTOR:]      He is lying. [¶] So you know nothing about these three Seattle robberies that

5                                        you confessed to?

6       "[THE DEFENDANT:]         I did not confess to anything.  I just put my signature on what he asked me

7                                        to put it on so he would let my friends and cousin go.

8       "[¶] . . . [¶]

9

10     "[THE PROSECUTOR:]      And so my question was is that your signature [on the waiver]?

11     "[THE DEFENDANT:]         And my answer is that I signed that, yes.

12

13     "[THE PROSECUTOR:]      And it actually tells you your rights at the top, right?

14     "[THE DEFENDANT:]         I didn't read it.  I don't know.

15     "[THE PROSECUTOR:]      Oh, you didn't read it?

16     "[THE DEFENDANT:]         No.

17     "[THE PROSECUTOR:]      Was it read to you by the agents?

18     "[THE DEFENDANT:]         No, it wasn't.

19     "[THE PROSECUTOR:]      So if they were to testify that they read you your rights they would be

20                                       mistaken?

21     "[THE DEFENDANT:]         They would be lying; same as they did in the report.  I read it already.

22

23     "[THE PROSECUTOR:]      So it's your testimony today that all of Special Agent Alvarez's testimony that you heard told was a lie?

24

25     "[THE DEFENDANT:]         Some of it was true.  The fact that he was there at those specific times and certain parts, you know, that he

26                                      interviewed me, the fact they brought

| | | |
|---|---|---|
| 1 | | me – that I was brought – he was brought into the room I was at.  He was mistaken on his dates.  And the time of the different interviews.  He said he interviewed somebody at a certain time in the middle of the day before I was arrested but in fact he interviewed them afterwards. |
| 5 | "[THE PROSECUTOR:] | But when it came to you telling him you confessed to five different robberies he is lying? |
| 7 | "[THE DEFENDANT:] | Yeah.  I did not give him those ideas.  He gave them to me, presented me with the paper.  I signed them. |
| 9 | "[THE PROSECUTOR:] | And when it comes to him saying that you confessed to three Seattle robberies, he is lying? |
| 11 | "[THE DEFENDANT:] | Yes.  And actually you have asked me that three times and I keep giving you the same answer. |
| 13 | "[THE PROSECUTOR:] | Thank you. [¶] And he is the one who brought up the Seattle robberies not you, correct? |
| 15 | "[THE DEFENDANT:] | Yes.  As soon as I told him I came from Seattle he said, 'Oh, well, hold on.'  And he started looking in his folder for some more stuff.  'Weren't there some robberies similar to these?'  And that is where that came from.  And [the other agent] was very familar – excuse me. [The other agent] was very familiar with the robberies in question something about Fourth Avenue, and I told them I was living in that area in the downtown area and that is when that came up. |
| 23 | "[THE PROSECUTOR:] | And so when Special Agent Alvarez said you changed your appearance after seeing a picture of yourself in the newspaper he is lying? |
| 25 | "[THE DEFENDANT:] | Well, he is mistaken to a point.  I did change my appearance after I seen [sic] the picture in the newspaper and |

8

> received several calls from my sister, relatives, and friends. I did not change it because I had seen [sic] a picture of me. I changed it because I seen a picture that looked like me, and they were asking, 'Is that you?' . . . ."

In rebuttal, the prosecutor recalled Agent Alvarez who testified that when he began the interview with defendant, the agent was not aware of the Seattle bank robberies but that "almost immediately" after the interview began, defendant "wanted to start discussing some bank robberies in Seattle." Agent Alvarez told defendant to "hold off" discussing the Seattle robberies." After defendant discussed the Sacramento robberies, defendant went into "[a]s much detail as he could recall" about the Seattle robberies. It was defendant who initiated the confessions. Agent Alvarez never told defendant he would get to a deal if he cooperated because the agent was not "going to jeopardize this case and the work of other people making some kind of felonious promise or agreement or plea bargain with" defendant that the agent did not have the authority to make. Agent Alvarez never told defendant that "his friends and girlfriend . . . were going to go down for the robberies if he did not confess."

(Lodged Doc. 4 at 3-7).

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). However, prosecutorial misconduct does not, *per se*, violate a petitioner's constitutional rights. *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing *Darden*, 477 U.S. at 181; *Campbell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citations omitted). *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002). The due process analysis in such claims focuses on "the fairness of the trial, not the culpability of the prosecutor," *Smith v. Phillips*, 455 U.S. 209, 219 (1982), and relief is limited to cases in which the petitioner can establish that the misconduct resulted in actual prejudice. *Johnson*, 63 F.3d at 930 (citing *Brecht v. Abrahamson*, 507 U.S. 619,

9

637-38 (1993)); *see also Darden*, 477 U.S. at 181-83; *Turner*, 281 F.3d at 868; *O'Bremski v. Maas*, 915 F.2d 418, 420 (9th Cir. 1990).  In other words, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

### 1.    Cross-Examination Regarding The Seattle Bank Robberies

Petitioner's first ground for relief alleges that the prosecutor committed misconduct by cross-examining him regarding his alleged confession to uncharged bank robberies committed in Seattle after the prosecutor had previously agreed to a defense motion in *limine* to exclude reference to those robberies.  The California Court of Appeals, Third Appellate District considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> The applicable federal and state standards regarding prosecutorial misconduct are well settled.  "'A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (People v. Gionis (1995) 9 Ca.4th 1196, 1214-1215.)

> Here, while defendant is correct that the prosecutor agreed not to bring up the Seattle robberies, defendant is wrong that the prosecutor committed misconduct or violated his constitutional rights in asking defendant about those robberies or that the evidence was irrelevant.

> As we have previously stated, defense counsel moved to "exclude any reference" to "prior bank robberies in Seattle" committed by defendant, and the prosecutor agreed to "admonish the witnesses." While the People argue that this exchange shows that the prosecutor agreed only to admonish *her witnesses* not to refer to the Seattle bank robberies, we do not read the exchange so narrowly.  Defense counsel's motion was to exclude *any* reference to the Seattle bank robberies, and the prosecutor did not ask to revisit the issue should defendant elect to testify as she had moments earlier during another in *limine* motion to exclude any reference to defendant's gang-related tattoo.  In our view, a fair reading of the exchange was that the prosecutor agreed to exclude any reference to the Seattle bank robberies, which would encompass questioning defendant about them.

Our view, however, does not lead to the conclusion that the prosecutor committed misconduct or violated defendant's constitutional rights when she asked defendant about the Seattle bank robberies. Prosecutorial action rises to these levels only if "'it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"'" or "'involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (*People v. Gionis*, *supra*, 9 Cal.4th at pp.1214-1215.) The prosecutor's conduct did neither, as the evidence was relevant by the time of defendant's cross examination.[FN 1]

> FN 1   We note it was the court that overruled defense counsel's objection to the prosecutor's question about the Seattle bank robberies, thereby allowing in the evidence.

Evidence of defendant's confession was an admission of a party (Evid. Code, § 1220) and was relevant because it had a "tendency in reason" (Evid. Code, § 210) to refute defendant's claims that Agent Alvarez provided him the details of the Sacramento bank robberies and that he confessed to those crimes simply to secure the release of his friends and cousin. Specifically, Agent Alvarez testified that his jurisdiction encompassed Bakersfield to Oregon and that he was not aware of the Seattle robberies until defendant mentioned them. The evidence that, contrary to defendant's testimony, defendant volunteered the information about the Seattle bank robberies about which Alvarez would not have known tended to refute defendant's similar claim that it was Alvarez who provided the details about the Sacramento bank robberies and that defendant's confession was linked to securing the release of his friends and cousin. Because the evidence was relevant for these purposes, the prosecutor did not commit misconduct in eliciting the testimony regarding the Seattle bank robberies.

Given our finding that the prosecutor did not commit misconduct, we reject defendant's argument that "[t]he prosecutorial misconduct violated [his] federal constitutional right to due process."

(Lodged Doc. 4 at 7-10.)

Petitioner has failed to demonstrate that the alleged prosecutorial misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Ortiz-Sandoval*, 81 F.3d at 899. As the state appellate court noted, the complained of line of questioning was relevant to refute defendant's testimony that Agent Alvarez had provided him with the details of the Sacramento robberies and that Petitioner's confession was given solely to secure the release of his

friends.  Moreover, after reviewing the record, the questions do not appear to be part of a larger pattern of improper conduct.  In the context of the trial as a whole, the improper questions did not so infect the trial with unfairness that Petitioner's resulting conviction constituted a denial of due process.

Even assuming, *arguendo*, that Petitioner had presented evidence in support of this claim, he still could not establish prejudice flowing therefrom.  Petitioner has not demonstrated a reasonable probability that the result of his trial would have been different even if his allegation that the prosecutor committed misconduct by improperly referencing the Seattle robberies was credited.  That is the case because the allegation raised by this claim would not have changed the testimony of, for example, Gwendolyn Cluck, Christopher Astacio or Cheryl Dahlin, the bank employees who all identified Petitioner before the jury as the person who had committed the robberies.  Nor would Petitioner's claim have changed the testimony of Brian Alvarez, the FBI agent who testified regarding Petitioner's detailed confession to committing the five bank robberies.  Petitioner's claim also would not have impacted the substantial video, photographic, and fingerprint evidence admitted against him at trial.  Petitioner is not entitled to federal *habeas corpus* relief on this prosecutorial misconduct claim.

### 2. Cross-Examination Regarding Agent Alvarez And Vouching For A Witness

Petitioner's second ground for relief alleges that the prosecutor committed misconduct when she cross-examined him regarding Agent Alvarez's testimony and that she "pushed" Petitioner to call the agent a "liar."  Petitioner claims the prosecutor further committed misconduct by "vouching" for the agent's credibility during her closing statement.  The California Court of Appeal, Third Appellate District, noted that both parts of this claim were procedurally defaulted because Petitioner had failed to make the proper objections at trial.[3]  Nonetheless, the

---

[3] Respondent asserts that review of this claim is procedurally barred, since it was rejected by the California Court of Appeal on the grounds that no contemporaneous objections were made at trial to either the Prosecutor's questions during cross-examination of Petitioner or during the

appellate court also considered and rejected the claim on the merits, explaining its reasoning as follows:

> As to the questioning about Agent Alvarez's veracity, it was not the prosecutor, but rather defendant himself, who first introduced the idea that Agent Alvarez was lying. The prosecutor simply asked whether Agent Alvarez was "mistaken" when he testified that defendant "tr[ied] to begin the conversation . . . by going into detail about these three Seattle robberies." Defendant responded that Alvarez was lying. We will not fault the prosecutor for later asking defendant about Agent Alvarez's veracity when defendant first claimed the agent was lying.
>
> As to the alleged vouching for Agent Alvarez in closing argument, defendant's argument fails because the prosecutor's comments on Alvarez's testimony were a fair representation of that testimony. Defendant's misconduct argument is focused on the prosecutor's statement in closing where she asked the jury if it made sense or was reasonable for Agent Alvarez to have made up the confession, committed perjury, subjected himself to criminal liability, and risked his career just to "get" defendant. These comments were fair based on Agent Alvarez's testimony that he never told defendant he would get a deal if he cooperated because the agent was not "going to jeopardize this case and the work of other people making some kind of felonious promise or agreement or plea bargain" with defendant that he did not have the authority to make. (See *People v. Lucas* (1995) 12 Cal.4th 415, 473 [prosecutors are given wide latitude to argue broadly the law and facts of a case].) There was no misconduct.

(Lodged Doc. 4 at 11-12.)

Petitioner's second prosecutorial misconduct claim is also without merit. As noted

---

prosecutor's closing argument. State courts may decline to review a claim based on procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977). As a general rule, a federal *habeas* court "'will not review a question of federal law decided by a state court of the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). However, a reviewing court need not invariably resolve the question of procedural default prior to ruling on the merits of a claim where the issue of procedural default turns on difficult questions of state law. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997). *See also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."). Under the circumstances presented here, the court finds that Petitioner's claims can be resolved more easily by addressing them on the merits. Accordingly, the court will assume that Petitioner's claims are not procedurally defaulted.

by the California Court of Appeal, the prosecutor initially asked Petitioner if Agent Alvarez was mistaken, and it was Petitioner who first claimed Agent Alvarez was, in fact, lying.  On these facts, it cannot be said that the prosecutor's line of questioning was improper.

In addition, Petitioner's allegations of improper vouching are not supported by the record.  "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness' veracity, or suggesting that information not presented to the jury supports the witnesses' testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993); *see also United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990).  Improper vouching has been found, for example where the prosecutor "plainly implied that she knew [a Federal agent] would be fired for committing perjury and that she believed no reasonable agent in his shoes would take such a risk." *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005).  The *Weatherspoon* court held that the prosecutor's urging that legal and professional repercussions served to ensure the credibility of the officers' testimony sufficed for the statement to be considered improper vouching based upon matters outside the record. *Id. See also United States v. Pungitore*, 910 F.2d 1084, 1124 (3rd Cir. 1990) (A prosecutor's statement that federal agents would not have coached witnesses because they would have "jeopardized our jobs, our careers, our right to practice law, they're [sic] right to continue as FBI agents . . ." was found improper.)

Here, by contrast, the prosecutor did not express her own belief as to the credibility of any witnesses or imply that any information not in evidence supported their accounts or assured their credibility.  Rather, as the appellate court discussed, the prosecutor summarized relevant testimony in the record and used it to offer reasonable inferences which supported her case, including that Agent Alvarez had no motivation to lie, file false a false police report, plant fingerprints, or concoct a confession just to "get" Petitioner.  The prosecutor's summery of Agent Alvarez's testimony was reasonable in light of his testimony that he never told defendant he would get a deal if he cooperated because the agent was not "going to jeopardize this case and the work of other people making some kind of felonious promise or agreement or plea bargain" with

defendant that he did not have the authority to make.  Reporter's Transcript on Appeal at 376-77.
Moreover, the prosecutor's argument was in rebuttal to several claims made by Petitioner during his
trial testimony including, *inter alia*, that Agent Alvarez was lying and that he only confessed to
committing the robberies to secure the release of his friends.  All of the prosecutor's references were
based on evidence that was in the record or upon inferences that could reasonably be drawn
therefrom.  Moreover, nothing the prosecutor said gave the impression that she was personally aware
of the witness' truthfulness.  The complained of statements did not constitute improper vouching.

Additionally, as with Petitioner's first prosecutorial misconduct claim, discussed
above, Petitioner has not shown that he suffered actual prejudice as a result either of the challenged
line of questioning or alleged improper vouching by the prosecutor.  In light of the evidence
presented against Petitioner at trial, there is no likelihood that the complained of line of questioning
or closing remarks had a substantial and injurious effect or influence in determining the jury's
verdict.  Thus, Petitioner's trial was not so unfair that his resulting conviction constituted a denial
of due process.  Petitioner is not entitled to federal *habeas corpus* relief on the grounds that the
prosecutor committed misconduct either during cross-examination of Petitioner regarding Agent
Alvarez or by improperly vouching for Agent Alvarez during her closing statement.

### 3.    Cumulative Effect Of Prosecutorial Misconduct

Petitioner claims a violation of his due process rights as a result of the cumulative
effects of the prosecutorial misconduct he alleges took place during his trial.  The combined effect
of multiple trial errors may give rise to a due process violation if the trial was rendered
fundamentally unfair, even where each error considered individually would not require reversal.
*Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Donnelly v. DeChritoforo*, 416 U.S. 637,
643 (1974) and *Chambers v. Mississippi*, 410 U.S. 284, 290 (1973)).  The fundamental question in
determining whether the combined effect of trial errors violated a defendant's due process rights is
whether the errors rendered the criminal defense "far less persuasive," *Chambers*, 410 U.S. at 294,
thereby having a "substantial and injurious effect or influence" on the jury's verdict.  *Parle*, 505

F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).  Where no individual error rises to the level of a constitutional defect, however, the sum of the errors cannot accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir.1999).

As discussed above, Petitioner has failed to establish a denial of his federal constitutional rights as a result of his individual prosecutorial misconduct claims.  He therefore cannot establish that the cumulative effect of the prosecutor's alleged misconduct rendered his trial fundamentally unfair or his defense far less persuasive.  The record reflects that Petitioner received a fair trial.  He is not entitled to federal *habeas corpus* relief on this claim.

### B.    The *Marsden* Motion

Petitioner fourth and final claim alleges that the trial court erred in denying his mid-trial motion to substitute counsel, pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970).  According to Petitioner, his court appointed attorney disclosed confidential communications subject to attorney-client privilege to a psychiatrist, Dr. Charles Schaffer, who was appointed by the court at the request of both parties to determine whether Petitioner was competent to stand trial.  Dr. Schaffer, in turn, disclosed the communications to the trial court and the prosecution in a written competency evaluation.  Petitioner claims that the breach of the attorney-client privilege led to an irreconcilable breakdown in communication between himself and his attorney.  Thus, the failure of the trial court to substitute counsel ultimately led to a denial of his Sixth Amendment right to counsel.

### 1.    The Evaluation

Dr. Schaffer compiled his written competency evaluation (hereinafter, the "evaluation") after conducting two separate interviews with Petitioner and reviewing the criminal complaints.  The doctor also spoke to Petitioner's trial counsel to determine counsel's opinion of Petitioner's competency to stand trial based on his interactions with Petitioner throughout the course of his representation.  The evaluation itself is very organized, with headings detailing the information being discussed and the source of that information.  The bulk of the evaluation contains

information obtained from Petitioner.

The first main section of the evaluation focuses on "Historical Information Provided By [Petitioner]." Clerk's Transcript on Appeal (hereinafter "CT") at 275-78.[4] This section is further divided into subsections entitled "Defendant's Description of Current Offense," "Psychiatric History," "History of Drug and Alcohol Use," "Legal History," "Family Psychiatric History," "Medical History," "Social and Developmental History," and "Most Recent Living Situation." *Id.* Notably, when asked about his current offense, Petitioner claimed he did not know when, where, or why he was arrested or incarcerated. CT at 275. Petitioner also claimed he did not do anything and he did not know why he was there. *Id.* According to the evaluation, "[t]he examiner informed [Petitioner] that the Complaints indicate that he was arrested for multiple counts of bank robbery in 2002. He denied he committed these robberies." *Id.*

The second main section of the evaluation assesses Petitioner's "General Mental Status" and does not contain any subsections. CT at 28-79. In this section, Dr. Schaffer notes that he "had difficulty obtaining any meaningful information from [Petitioner] because he was evasive and frequently responded, 'I don't know,' or 'I don't remember,' or 'What does that mean?' He gave these responses even when asked simple questions about his biographical history or questions such as 'who is your attorney.'" CT at 278.

The evaluation's third main section is titled "Clinical Evaluation Related to Competency to stand trial." CT at 279-281. This section is divided into subsections examining Petitioner's "Relationship with Attorney," "Understanding of Current Legal Situation," "Understanding of Common Legal Terms," "Major Courtroom Participants," "Rights as a Defendant," and "Courtroom Behavior." *Id.* Petitioner claimed he "did not know what the word attorney means" and was unable to discuss his attorney's representation of him in any detail. CT

---

[4] Dr. Schaffer's evaluation was removed from the CT and lodged separately in the record under seal on September 8, 2010. It is nonetheless part of the CT and remains paginated as part of the CT.

at 279.  As discussed above, Petitioner professed to be unable ro discuss any aspect of his legal situation and claimed he did not know why he was arrested or incarcerated.  *Id*.  He also claimed he was unable to define most of the legal terms or to identify the major courtroom participants posed to him by Dr. Schaffer.  CT at 280.  He claimed he did not know any of his rights as a criminal defendant and claimed not to understand the nature or purpose of a court appearance.  CT at 281.

The fourth main section of the evaluation examines Petitioner's "Capacity to Make Decisions Regarding Antipsychotic Medications."  *Id*.  The subsections explore Petitioner's "Diagnosis," "Nature and Purpose of Proposed Treatment," "Risks and Benefits of Proposed Treatment," "Probability of Success of Proposed Treatment," "Alternative to Proposed Treatment," and "Risks of Foregoing Treatment."  *Id*.  Again, Petitioner either responded with uncertainty or evaded responses to many of Dr. Schaffer's questions regarding the subjects in this section of the evaluation.

The fifth and sixth main sections of the evaluation discuss information obtained from sources other than Petitioner.  The fifth section, "Review of Records," is divided into three subsections, including "Complaints," "Police Reports," and "Documented Legal History."  CT at 282.  The sixth section focuses on "Other Sources of Information," but consists solely of one subsection, "Contact with [Petitioner's Counsel] []."  CT at 282-83.  This subsection summarizes a July 6, 2005 phone conversation taking place between Dr. Shaffer and Petitioner's counsel.  *Id*.  Counsel expressed doubt as to Petitioner's competency and stated that he had noticed a change in his client's mental status throughout the course of his representation.  CT at 282.  Counsel doubted that Petitioner was being truthful about his mental status.  *Id*.  Counsel also discussed Petitioner's arrest and the charges he faced with Dr. Schaffer, as well as Petitioner's living situation at the time he was arrested.  Lastly, the subsection detailing information obtained from Petitioner's attorney contains the following paragraph:

> Mr. Carranza acted appropriately in court prior to his admission to the second floor [psychiatric unit of the Sacramento County Jail].  He was respectful and rational at that time.  He was able to state that he

18

was on a methamphetamine binge at the time of his arrest. *He admitted to robbing the banks to [his attorney] but he never explained the reason for these robberies.* He had three pending charges in Washington State for bank robberies. He has gang related tattoos.

CT at 283 (emphasis added). It is the italicized sentence upon which Petitioner bases his claim that counsel improperly disclosed a confidential and privileged attorney-client communication to Dr. Schaffer and, in turn, to the trial court and the prosecution.

The seventh and final main section of the evaluation contains Dr. Schaffer's "Conclusions" regarding Petitioner's competency to stand trial. CT at 283-84. Based upon the information discussed above, Dr. Schaffer found insufficient and incompatible evidence to conclude that Petitioner suffered from a psychiatric disorder, that he was unable to understand the proceedings, or that he was unable to assist his counsel in a rational manner. CT at 283.

## 2.    The *Marsden* Hearing

On October 12, 2005, after trial had commenced and during the prosecution's presentation of its case-in-chief, Petitioner notified the trial court that he wished to fire his attorney and to have new counsel appointed by the court, pursuant to *Marsden*, 2 Cal.3d at 118. After clearing the courtroom of everyone but Petitioner, his counsel, courtroom security and court personnel, the judge asked Petitioner to explain the basis for his request. Petitioner's discontent with his attorney stemmed from Dr. Schaffer's evalution, Petitioner complained that a portion of the evaluation contained confidential information that he had shared with his attorney and that his attorney had improperly disclosed to Dr. Schaffer, thus breaching the attorney-client privilege. Petitioner pointed to the statement in the sixth section of the evaluation discussing information obtained by Dr. Schaffer from Petitioner's attorney, which states in relevant part that "[Petitioner] admitted to robbing the banks to [counsel], but he never explained the reason for these robberies." CT at 283. Although Petitioner admitted making the statement to his attorney, he stated his attorney told him, "Don't worry. I'm your attorney. I can't tell anybody this. It's against the law. I'll lose my license." CT at 167.

19

After Petitioner articulated the grounds for his *Marsden* motion, his attorney was given an opportunity to respond.  Counsel stated that he remembered speaking with Dr. Schaffer regarding Petitioner's competency evaluation.  CT at 168.  According to counsel's recollection, he discussed with Dr. Schaffer the factual background of Petitioner's case, the bizarre behavior exhibited by Petitioner throughout the course of counsel's representation, and the evidence compiled by the prosecution against Petitioner.  *Id.*  Counsel told the doctor that, upon his arrest, Petitioner had participated in a very detailed conversation with law enforcement in which he confessed to committing the robberies.  *Id.*  Counsel did not recall telling Dr. Schaffer that Petitioner had confessed committing the robberies directly to him.  *Id.*  The trial court then clarified counsel's recollection as follows:

| | |
|---|---|
| THE COURT: | All right. [Counsel], as I understand then, what you are saying is that what you related to Dr. Schaffer is not – and I just want to make sure I understand what you are telling me – was not, by your recollection, the substance of any confidential communications you had with your client; but, instead, you were relating to Dr. Schaffer the fact that Mr. Carranza had made a tape-recorded confession to the FBI agents in which he admitted during that conversation with the FBI agents to the robberies.  Is that my understanding of what you are saying? |
| [COUNSEL]: | Yes.   Now, the confession wasn't tape-recorded, so – |
| THE COURT: | Okay. |
| [COUNSEL]: | But I did talk to him in detail about it.  It was a three-page confession, typewritten, that went into great detail about what banks, what days, the reasons he gave to rob the Bank of America.  I went into details about the case because they always request some information about the case.

They asked me about my conversations with him. I went into nothing substantive, just how in the beginning we had no problem, that he was very alert; he knew the discovery.  He |

20

|  |  |
|---|---|
|  | had been acting pro per for quite awhile, that we could go over discovery in great detail, that he would point things out to me, and then that's when our communication started breaking down, that he started – again, when I would show up, he would say that he didn't know who I was and that he wanted to go home, etc. |
| THE COURT: | Okay.  But I want to make a distinction.  At least what I understand is that you did not relate to Dr. Schaffer any confidential, privileged attorney-client communications that you had with Mr. Carranza.  Instead, what you told Dr. Schaffer was that Mr. Carranza had admitted to the robberies to the FBI in his meeting with the FBI agents. |
| [COUNSEL]: | Correct. |
| THE COURT: | Okay. |
| [COUNSEL]: | That he went into great detail and confessed to it all and admitted it, and I don't – Again, you know, it's a conversation that you have and his report shows up like this. |

CT at 169-70.

After weighing Petitioner's claim, counsel's statements, and Dr. Schaffer's evaluation, the trial court orally denied Petitioner's *Marsden* motion, explaining its reasoning as follows:

> Mr. Carranza, I have read Dr. Schaffer's report, and it says what it says, but I believe [counsel].  I know that, you know, as an attorney, he understands the significance of confidential attorney-client communications, and he has related to the Court that he did not discuss or disclose any confidential communications between yourself and [counsel], but instead, related the fact that you had made certain statements to the FBI agents regarding your involvement in the robberies.   To the extent there are conflicts between the statements of Dr. Schaffer and [counsel], I believe [counsel].
>
> I find that [counsel] has properly represented the Defendant and will continue to do so, and I order – I will deny the motion.

CT at 170-71.  Petitioner requested that Dr. Schaffer be summoned to testify regarding exactly what information counsel had disclosed to him during their conversation.  CT at 171.  The trial court

denied Petitioner's request. *Id*. Petitioner then reiterated that he had lost all confidence in counsel's ability to represent him and that he felt it would be impossible to work with him going forward. *Id*. At this point, the hearing appeared to have concluded, and the court took a lunch recess.

Following the lunch recess, however, the court decided to return to Petitioner's *Marsden* motion, and again cleared the courtroom of everyone but security, courtroom security, court personnel, Petitioner, and his counsel. CT at 173. The trial court had reviewed Dr. Schaffer's evaluation during the lunch recess, with particular attention given to the section that drew Petitioner's concerns. CT at 174. As discussed above, Dr. Schaffer's evaluation was very clearly organized, detailing by section and subsection from precisely which source Dr. Schaffer obtained each item of information. Nonetheless, the trial court believed Petitioner had misinterpreted the section of the evaluation which he complained demonstrated a breach of the attorney-client privilege. Specifically, the trial court held:

> The way I read that paragraph is that Mr. Carranza, the Defendant, admitted and disclosed the robbing of the banks to [Counsel], but Mr. Carranza admitted this to Dr. Schaffer . . . [s]o I disagree with Mr. Carranza's interpretation. My reading and my interpretation is that Mr. Carranza disclosed to Dr. Schaffer that he had admitted to his attorney . . . that he robbed the banks.

CT at 174.

Petitioner disagreed with the trial court's interpretation that he was the source from whom Dr. Schaffer had obtained the information in question. Specifically, Petitioner directed the court to the section entitled "Historical Information Provided by Francisco Carranza," and the subsection "Defendant's Description of Current Offense," which he claimed refuted the trial court's interpretation of the statement's source. CT at 175. The pertinent section reads as follows:

> Mr Carranza claimed that he does not know when he was arrested or incarcerated for the present offense. He also stated that he does not know why he was arrested and incarcerated. He was able to state that he has been in jail "a couple of weeks." When he was asked where he was when he was arrested, he responded, "I don't remember. I didn't do anything. I don't know why I'm here." Moreover, Mr. Carranza could not recall his living situation prior to his arrest.

> The examiner informed Mr. Carranza that the Complaints indicate that he was arrested for multiple counts of bank robbery in 2002. He denied that he committed these robberies. He stated that he believes the current year is 2002.

CT at 275. Without resolving on the record the apparent inconsistencies noted by Petitioner, the trial court shifted its focus to a concern that Petitioner was using the *Marsden* motion as a delay tactic. CT at 175. Specifically, the trial court observed that, at the time of the *Marsden* hearing, the case had been pending for over three years, several trial dates had been set, Petitioner had filed a previous *Marsden* motion complaining of one of his public defenders, and Petitioner had represented himself *in propria persona* prior to requesting the appointment of his current trial counsel. *Id.* In response, Petitioner explained that the trial delays had been due in large part to the conflicting schedules of the various prosecutors and public defenders who had been assigned to his case. CT at 176-77. According to Petitioner, a prosecutor had asked for a continuance due to an upcoming vacation, a public defender had requested a continuance due to a family member's pending surgery, and the current prosecutor had asked for a continuance when she was assigned to the case. CT at 177. Petitioner also stated that he and the current prosecutor had mutually requested two short continuances totaling six months when he was acting *in propria persona* because he had not received all of the prosecution's discovery. *Id.*

The court, however, refused to delay the trial any longer, advising Petitioner that it was "[his] decision and choice as to whether or not [he] want[ed] to communicate and cooperate with [his] attorney . . . I am not going to declare a mistrial. I'm not going to continue this trial simply because you choose not to cooperate with your defense attorney." CT at 178. Nonetheless, Petitioner continued to complain of his relationship with counsel, informing the court that he had lost all confidence in counsel's ability to represent his interests. CT at 179. Petitioner additionally complained that, in light of the confidential information he continued to believe counsel had revealed to Dr. Schaffer, he felt he could no longer trust him. CT at 181. The court declined to get involved in the relationship between Petitioner and counsel, and repeated its finding that counsel had

23

not disclosed confidential information to Dr. Shaffer.  CT at 179.

Prior to concluding the *Marsden* hearing for the second time, the trial court gave counsel and Petitioner one final opportunity to be heard.  At this point, counsel informed the court that Petitioner no longer appeared willing to communicate with him regarding his case.  Specifically, counsel expressed his concerns as follows:

> After we got out of court, I went down and talked to him or tried to discuss the case with him.  It appears to me that he is either unwilling to talk to me or believes that I will do something to his detriment.  So at this point, this afternoon – or this morning after we got out of court, I tried to discuss with him the upcoming events and what else was going on.  He doesn't want to discuss any of the witnesses' testimonies or any possible defenses with me.
>
> An issue came up regarding him testifying at this point, and I'm aware that it's his right.  He does not want to listen to me about what I suggest on that point, and he feels that basically he can't trust me.  I just want to make clear that if, you know, we are at this point now for the rest of this trial, there will probably be very little communication between Mr. Carranza and I, and I don't know what the Court wants to do.
>
> I know the Court has ruled that there is insufficient grounds for the *Marsden* motion, but I just want to make the record clear that I'm in a position now where I can't really discuss this case with Mr. Carranza.  He doesn't want to tell me anything about what may or may not have happened during these robberies.  Up until this morning, we had been able to discuss the testimony and I could gather information from him, but now we are at the point where I don't feel like that's going to happen.

CT at 179-80.  In response to counsel's concerns, the court reiterated that it "was not about to declare

a mistrial simply because Mr. Carranza refuses to cooperate in his legal defense, and that's where we stand."  CT at 180.

### 3.    The Court of Appeal

Petitioner presented his claim that his *Marsden* motion was improperly denied on appeal to the California Court of Appeal, Third Appellate District.  The appellate court considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

When a defendant seeks to discharge his court-appointed counsel on the basis of inadequate representation, the court must allow the defendant to explain the basis of his claim and to relate specific instances of counsel's inadequate representation. (*People v. Smith* (2003) 29 Cal.4th 1229, 1244-1245.) We review the trial court's decision denying defendant's *Marsden* motion under the deferential abuse of discretion standard. (*Id.* at p. 1245.) As we will explain, there was no error either in the court's *Marsden* inquiry or its ruling.

As to the court's inquiry into defendant's complaint that his counsel revealed confidences to Dr. Schaffer, the record reflects the court was thorough in its investigation. The court first listened to defendant's complaint about his counsel, read the pertinent part of Dr. Schaffer's report, listened to defense counsel's belief about what he had told Dr. Schaffer, clarified defense counsel's position, re-read Dr. Schaffer's report, explained its position about the report, and then listened again to defendant. This procedure satisfied the court's duty to inquire into defendant's complaint about his counsel. There was no error, constitutional or otherwise, in the court's *Marsden* inquiry.

Nevertheless, defendant complains that the court should have brought in Dr. Schaffer to testify and allowed defendant to question the doctor about the contents of his report. We find no error for two reasons.

One, there was no indication Dr. Schaffer could come to court without unnecessarily delaying the proceedings. As we have noted, at the time of defendant's *Marsden* motion, the case had been pending for over three years, the People had begun presenting evidence, and defendant had previously engaged in dilatory tactics relating to discharging his attorney.

And two, the trial court's interpretation of the pertinent paragraph of Dr. Schaffer's report, namely, that defendant "admitted and disclosed the robbing of the banks to [defense counsel], but [defendant] admitted this to Dr. Schaffer" was reasonable, and therefore, there was no need for Dr. Schaffer's testimony. Notably, other paragraphs in the report discussing Dr. Schaffer's contact with defense counsel begin with "[Defense counsel] stated . . . ." The paragraph which contains the statement that defendant "admitted robbing the banks to [defense counsel]" does not begin with that phrase. The court therefore was correct in crediting defense counsel's explanation that he did not remember telling Dr. Schaffer that defendant confessed to counsel that he committed the crime.

As the foregoing discussion demonstrates, the trial court was correct in determining that defense counsel had not disclosed confidential information to Dr. Schaffer in violation of his ethical duties. The record also did not show "that counsel and defendant ha[d] become embroiled in such an irreconcilable conflict that ineffective representation [wa]s likely to result." (*People v. Jones*, 29 Cal.4th at pp. 1244-1245). As such, there was no error, constitutional or

otherwise, in the court's denial of defendant's *Marsden* motion.

(Lodged Doc. at 16-18).

### 4.   Legal Analysis

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel in a criminal prosecution. Such assistance must be effective and competent. *Strickland v. Washington*, 466 U.S. 668 (1984). Where a criminal defendant is proceeding with the assistance of counsel, he may move to dismiss or substitute counsel, whether appointed or retained. The denial of a motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and, therefore, presents a cognizable claim for federal *habeas corpus* relief. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994).

Whether a trial court grants or denies a motion to substitute counsel may depend on the motion's timeliness and the nature of the conflict between a defendant and his counsel. *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000); *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986); *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982). When a defendant indicates dissatisfaction with his counsel, the trial court ordinarily must conduct an inquiry in order to discover whether the situation is depriving the defendant of an adequate defense. *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) ("[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds of such a motion and that the matter must be resolved on the merits before the case goes forward."); *Hudson*, 686 F.2d at 829 (The state trial court's summary denial of a defendant's motion for new counsel "without further inquiry" violated the Sixth Amendment.). A trial court's inquiry regarding counsel's performance should be "such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern." *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991) (internal citations omitted). It should also provide a "sufficient basis for reaching an informed decision" regarding whether to appoint new counsel. *McClendon*, 782 F.2d at 789. If failure to conduct the proper inquiry results in the

constructive denial of counsel, it constitutes *per se* error.  *Schell*, 218 F.3d at 1027 ("the basic question is simply whether the conflict between [petitioner] and his attorney prevented effective assistance of counsel").

Even after a full inquiry, if the defendant and his attorney are embroiled in an "irreconcilable conflict," refusal to allow substitution of counsel may result in denial of the constitutional right to assistance of counsel generally, *Hudson*, 686 F.2d at 832, or to the effective assistance of counsel.  *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  The "[l]oss of confidence by the defendant in his counsel weighs heavily in the defendant's favor when he seeks to substitute counsel," unless the breakdown in the relationship flows from a defendant's own conduct.  *Hudson*, 686 F.2d at 832.  *See also Schell*, 218 F.3d at 1026 ("It may be the case, for example, that because the conflict was of [the defendant's] own making, or arose over decisions that are committed to the judgment of the attorney and not to the client, in fact he actually received what the Sixth Amendment required in the case of an indigent defendant . . . .").  Thus, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights," *Schell*, 218 F.3d at 1027, because the Sixth Amendment guarantee of the right to counsel does not include a right to "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

In reviewing a trial court's decision to deny a motion to substitute counsel in the context of a section 2254 proceeding, such as this, the focus is different than on direct appeal.  In this regard, the Ninth Circuit has explained:

> Our primary reason for accepting this case for *en banc* review was to correct the standard of review we have been using to examine the constitutionality of a state court's handling of a motion to substitute appointed counsel based on allegations of an irreconcilable conflict. In *Bland*, we said that the test is whether a state court's denial of such a motion was for an "abuse of discretion." *Bland*, 20 F.3d at 1475.
>
> . . . .
>
> [O]ur only concern when reviewing the constitutionality of a state-court conviction is whether the petitioner is "in custody in violation

27

of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  *See also Coleman v. Thompson*, 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("The [habeas] court does not review a judgment but the lawfulness of the petitioner's custody *simpliciter*.") (emphasis in original).  A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect.

*Schell*, 218 F.3d at 1024-25 (footnotes omitted).  Thus, "the ultimate constitutional question the federal courts must answer" is whether the alleged error of the state court "actually violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  *Id*. at 1026.

    In this case, neither party takes issue with the timing of Petitioner's *Marsden* motion, and Petitioner does not allege that the trial court failed to conduct an adequate inquiry with regard to the grounds of his motion or failed to allow him to express his concerns in full.  Indeed, as summarized above in section (B)(2), the trial court conducted a full hearing on Petitioner's *Marsden* motion.  Petitioner was given adequate opportunity to discuss the basis for his *Marsden* motion, and trial counsel was given adequate opportunity to respond.  Petitioner's main allegation, therefore, is that the trial court erred when it determined that his trial counsel had not breached the attorney-client privilege by disclosing to Dr. Schaffer that Petitioner had confessed to counsel that he committed the robberies.  Though Petitioner's discussion of this issue in his petition is brief, during the *Marsden* hearing he claimed that he could no longer trust counsel and had no confidence in counsel's continuing ability to represent him throughout the remainder of the trial based on his belief that the privilege had been breached.  In addition, counsel informed the court during the *Marsden* hearing that, although he had previously been able to communicate with Petitioner regarding the defense of his case, Petitioner now refused "to discuss any of the witness' testimonies or any possible defenses" with him.  CT at 180.  It appears, therefore, that Petitioner is claiming that his

belief that counsel had breached the attorney-client privilege caused him to distrust counsel to such an extent that they became "embroiled in an irreconcilable conflict," and thus he was effectively denied the assistance of counsel altogether.

It is clear from the record of the *Marsden* hearing that the trial court made an adequate inquiry into Petitioner's complaint, and gave Petitioner sufficient opportunity to explain his concerns.  As noted by the California Court of Appeal, the trial court "first listened to defendant's complaint about his counsel, read the pertinent part of Dr. Schaffer's report, listened to defense counsel's belief about what he had told Dr. Schaffer, clarified defense counsel's position, re-read Dr. Schaffer's report, explained its position about the report, and then listened again to defendant."  CT at 166-181.  After considering all of the available evidence, the trial court found counsel's explanations to be credible, holding that "[t]o the extent that there are conflicts between the statements of Dr. Schaffer and [counsel], I believe counsel."  CT at 171.  A federal court conducting a *habeas corpus* review has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  Because the trial court found counsel to be credible, it determined that he understood the significance of the attorney-client privilege and that he did not disclose confidential communications between himself and Petitioner to Dr. Shaffer.  The trial court's factual findings are supported by counsel's statements on the record and are entitled to a presumption of correctness, which Petitioner has not rebutted by clear and convincing evidence.[5]  28 U.S.C. § 2254(e)(1).  *See*

---

[5] While the trial court initially based its ruling upon trial counsel's credibility, the trial court's reading and interpretation of Dr. Schaffer's report, which occurred after the lunch recess during the second part of the *Marsden* hearing is troubling.  Despite the clear and organized manner in which Dr. Schaffer's evaluation is divided into sections and subsections denoting from precisely which source he obtained each item of information, the trial court attributed to Petitioner the statement that "[Petitioner] admitted to robbing the banks to Mr. Brennan, but he never explained the reason for these robberies."  In fact, this statement is clearly found in the section of the evaluation entitled "Other Sources of Information," within the subsection "Contact with [Counsel]."  Nevertheless, the trial court interpreted the statement as meaning that it was actually Petitioner who had disclosed to Dr. Schaffer that he had previously admitted to his counsel that he committed the robberies.  The trial court's interpretation of the evaluation is, however, irrelevant in light of the its clear holding that, to the extent a conflict existed, it found counsel's explanations to be more

29

*also Plumlee v Masto*, 512 F.3d 1204, 1209 (9th Cir. 2008) (holding that state court factual findings are entitled to a presumption of correctness unless rebutted by clear and convincing evidence). The court also found that counsel had properly represented Petitioner up until the point of the *Marsden* hearing, and that he would continue to do so. This determination is also supported by a review of the record, which reflects that counsel thoroughly challenged the prosecution's case through cross-examination, presented witnesses to testify in Petitioner's defense, continued to offer advice to Petitioner regarding his decision to testify, and made a competent closing argument to the jury on behalf of his client.

Petitioner further complained during the *Marsden* hearing that counsel should be discharged because "he told [Petitioner] straight out, 'We are going to lose," causing Petitioner to lose confidence in his case. CT at 179. To the extent that Petitioner's distrust of counsel flowed from counsel's frank and honest assessment of the likelihood of success on the merits of Petitioner's case at trial, Petitioner has failed to establish a Sixth Amendment violation. As the Second Circuit has noted,

> The starting point for effective representation is a realistic assessment of the prospects of success in light of the risks of failure. It is precisely this balancing process which leads many defense lawyers to advise their clients to enter plea negotiations.
>
> . . . .
>
> [T]hat a criminal defendant views this sort of frank advice as prejudgment of guilt does not thereby convert good representation into good cause.

*McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981) (citing *Brown v. United States*, 264 F.2d 363 369 (D.C.Cir. 1959) ("The constitutional right to counsel does not mean counsel who will be optimistic in his private appraisal of the evidence and his advice to the accused. Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism.")).

---

believable than Dr. Schaffer's evaluation. CT at 171. Therefore, the result of the *Marsden* hearing would have been the same whether the trial court's interpretation of the statement's source was reasonable or not.

Petitioner also has claimed that that his *Marsden* motion should have been granted because, according to his petition, even his attorney "declared a conflict." (Pet. at 5.) Petitioner mischaracterizes counsel's *Marsden* hearing statements. In fact, counsel informed the court that although Petitioner had been cooperative and communicative up until that point, he was now refusing to communicate with counsel or to participate in his own defense. The trial court, as discussed above, found no basis for Petitioner's unwillingness to cooperate with counsel, and properly informed Petitioner that it was his "decision and [his] choice as to whether or not to communicate and cooperate with [counsel]. I am not going to declare a mistrial. I'm not going to continue this trial simply because you refuse to cooperate with your defense attorney." CT at 178. A criminal defendant "cannot simply refuse to cooperate with his appointed attorney and thereby compel the court to remove that attorney. If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants would effectively have veto power over any appointment and by process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." *People v. Michaels*, 28 Cal.4th 486, 523 (2002) (internal citations omitted). Indeed, no Sixth Amendment violation occurs "when a defendant is represented by a lawyer free of any actual conflicts, but with whom the defendant refuses to cooperate because of dislike and distrust." *Plumlee*, 512 F.3d at 1211.

Because Petitioner did not suffer a constructive denial of counsel, in order to be entitled to relief he must demonstrate prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). *Schell*, 218 F.3d at 1028 ("if the serious conflict did not rise to the level of a constructive denial of counsel, however, [the petitioner] would have to prove he was prejudiced by the conflict"). As the Ninth Circuit has stated,

> The line between cases such as *Brown*, *Slappy*, and this case, on the one hand, and those in which the issue is ineffective assistance of counsel, on the other, is sometimes unclear. Logic alone dictates that the greater the hostility between defendant and his counsel, the longer the duration of the rupture in relations between the two, the less

> communication there is between them, and the more ineffective the counsel's performance appears, the more likely it is that the case will be analyzed in terms of whether the defendant was represented by counsel. If so analyzed, a conclusion that no counsel existed invokes the full force of *Gideon v. Wainwright*, 372 U.S. 335 (1963). If instead the conclusion is that representation did exist, the issue then becomes whether the defendant received such ineffective assistance of counsel as to prejudice his defense. We have discussed this line between no-counsel cases and ineffective counsel cases previously. (Citations omitted.) We adhere to those discussions.
>
> Having concluded, in effect, that the defendant in the case had counsel, we have considered from the standpoint of whether a substitution should have been allowed on the ground that defendant's counsel was ineffective. We find that no such basis for such an order existed. [Counsel] represented the petitioner effectively.

*Hudson*, 686 F.2d at 832. The same is true here. As discussed above, a review of the record reflects that counsel performed competently at trial. Despite Petitioner's reluctance to proceed with his appointed trial counsel, it appears that counsel was able to present a professional and adequate defense to the charges against Petitioner. Indeed, Petitioner does not now raise a claim of ineffective assistance of counsel, nor does he challenge any particular aspect of his counsel's performance at trial. Consequently, there is no basis to conclude that a substitution of counsel should have been allowed on the ground that Petitioner's counsel was ineffective.

For the foregoing reasons, Petitioner has failed to demonstrate that his constitutional rights were violated by the trial court's denial of his *Marsden* motion to substitute counsel. He is, therefore, not entitled to federal *habeas corpus* relief on this claim.

## VII.  CONCLUSION

Accordingly, IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: September 28, 2010

_Charlene H. Sorrentino_
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

33